IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 1, 2021

## WALTER SHEGOG v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 13-01793  Jennifer Johnson Mitchell, Judge**

_____

### No. W2019-01966-CCA-R3-PC
_____

In 2014, the Petitioner, Walter Shegog, was convicted of theft of property valued at more than $1,000 but less than $10,000.  The Petitioner received a twelve-year sentence as a Career Offender and later appealed his conviction to this court.  We affirmed the judgment of the trial court.  *State v. Walter Shegog*, No. W2014-02440-CCA-R3-CD, 2015 WL 12978195 (Tenn. Crim. App., at Jackson, Oct. 13, 2015), *perm. app. denied* (Tenn. Feb. 19, 2016).  Subsequently, the Petitioner filed a petition for post-conviction relief alleging that the State had committed a *Brady* violation by withholding exculpatory evidence and that he had received the ineffective assistance of counsel on multiple bases. After a hearing, the post-conviction court denied the petition, and the Petitioner appeals. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and J. ROSS DYER, JJ., joined.

Walter Shegog, Hartsville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Facts and Background

This case originates from the Petitioner's theft of the victim's vehicle.  Based on this conduct, a Shelby County grand jury indicted the Petitioner for theft of property valued at more than $10,000 but less than $60,000.

# A. Trial

The following is a summary of the facts presented at the Petitioner's trial:

The State's proof at the [Petitioner's] August 2014 jury trial established that the victim, Justine Lane, placed an advertisement in the newspaper offering her 2006 Mustang convertible for sale. On Monday, September 17, 2012, the victim's husband awoke not feeling well, so the Lanes decided to go to the Veteran's Administration Hospital ("V.A. Hospital") in Memphis to see if Mr. Lane, a disabled veteran, could be seen by a doctor. Just before they left, the victim answered a telephone call from a man who identified himself as Corey Maclin inquiring about the Mustang. The victim noticed that the caller identification on her telephone listed the location of the call as the V.A. Hospital and asked the caller if he was calling from that location. The caller told the victim that he worked at the V.A. Hospital. The victim and the caller made plans to meet at the V.A. Hospital so that the caller could look at the car.

Shortly after the Lanes arrived at the V.A. Hospital, they met the person identifying himself as Corey Maclin but whom both later identified as the [Petitioner]. Mr. Lane went into the clinic, and the victim took the [Petitioner] to the parking lot to show him the car. As they walked to the car, the [Petitioner] inquired whether the vehicle was equipped with OnStar or a theft protection system. The [Petitioner] asked to see the vehicle's engine and interior and asked the victim to start the car so that he could see how it ran. The [Petitioner] then got into the driver's seat and told the victim that he was "'gonna just drive it right around here.'" Mr. Lane came out of the clinic just as the [Petitioner] drove the car out of the parking lot.

When the [Petitioner] did not return within a few minutes, Mr. Lane suggested that the victim go inside and ask if a person named Corey Maclin worked there. When they learned that no one by that name worked at the V.A. Hospital, the Lanes went to speak with the V.A. Hospital police. Before they got to the V.A. Hospital police office, the [Petitioner] telephoned the victim and said, "'I'm sorry I'm taking so long. I went to the bank to . . . get the funds and get the money—get a check and everything.'" The victim told the [Petitioner] to bring the car back because her husband had already called the police. The [Petitioner] told her that he would be back in 10 minutes, and she told him that she would "let the police know" that the [Petitioner] had not taken the car and that she had made a mistake. When the [Petitioner] did not arrive within the time allotted, Mr. Lane suggested that the victim try to call the [Petitioner], but the number actually belonged to an Office Max. The person who answered

3

the phone confirmed that the [Petitioner] "'came in to use the phone, and he told me that he had to call his boss and tell his boss he was running a little bit late at work.'" At that point, the Lanes reported the theft to the V.A. Hospital police and the "city police."

Two days later, Memphis Police Department ("MPD") officers responded to a call of a domestic disturbance at the Tanglewood Street residence that the [Petitioner] shared with his father and his sister, Walteria Shegog. Apparently, the [Petitioner] telephoned the police after his sister "threw a cookie at him." Ms. Shegog told the police that on September 17, 2012, the [Petitioner] "left walking; and when he came back, he was in a car—a silver Mustang." Although the [Petitioner] had left before the police arrived, he came walking up the street as Ms. Shegog spoke with them. After officers learned that the Mustang had been reported stolen, they detained the defendant and searched his pockets, where they found the keys to the Mustang. They placed the [Petitioner] under arrest at that time.

That same day, the victim went to the police station and identified the [Petitioner] from a photographic lineup. Officers then told her that her car had been impounded. When she went to collect it, the car had a different license plate. She said that the Kelly Blue Book value of the car was $12,999.00 and that she had advertised the car for $12,000.00. She sold the car on the following Saturday for $10,000.00.

The 60-year-old [Petitioner] testified that he went to the V.A. Hospital on September 17, 2012, to see his doctor and that as he sat outside, he saw the victim's Mustang sitting in the parking lot with a "for sale" sign in the window. He said that he telephoned the victim and asked to look at the car, but he denied providing a false name or telling the victim that he worked at the V.A. Hospital. The [Petitioner] said that he asked the victim if he could take a test drive, and she agreed. He claimed that he initially wanted to take the car "to the freeway to take it on a spin" but that, when it began to rain, he decided to go to the Office Max to make flyers for his "own little business." He said that he tried to telephone the victim from his cellular telephone, but the battery was low, so he asked to use the telephone at Office Max. When he learned that the victim had already telephoned the police, he panicked because he had been previously convicted of several felonies and because he had seen "police association" stickers on the car. At that point, he drove the car to his father's house and parked the car down the street "in front of the state trooper's house" and "put the keys inside of the console of that vehicle." He said that it was his hope that the "trooper" would discover the car and return it to the victim. He insisted that he did not intend to steal the car, saying that he did not "mess with women and

4

children and ill people." The [Petitioner] denied having the keys to the Mustang in his pocket at the time of the arrest and insisted that he did not alter the appearance of the car in any way.

*Shegog*, 2015 WL 12978195, at *1-2.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief, *pro se*, which was later amended by appointed counsel, alleging that the State had committed a *Brady* violation by withholding exculpatory evidence and that he had received the ineffective assistance of counsel on multiple bases.

In February 2019, a post-conviction hearing was held at which the Petitioner testified that he was alleging the ineffective assistance of counsel by his attorney at trial ("trial counsel"). He testified that he represented himself during trial proceedings for four months before trial counsel was appointed to serve as elbow counsel. The Petitioner testified that he wanted to enter a defense of diminished capacity, and the trial court would not allow him to do so without counsel. The Petitioner testified that he had been diagnosed with PTSD, schizophrenia, bipolar disorder, and depression. The Petitioner stated that trial counsel did not communicate with him until the day of trial and that he did not obtain medical records or other pertinent information with regards to the Petitioner's case. The Petitioner obtained his own medical records from the Veteran's Administration ("the VA") where he had been treated. The Petitioner gave his records to trial counsel, and trial counsel sent an investigator to interview the Petitioner in prison. The Petitioner tried to follow up on his interview with trial counsel, but he never heard back.

The Petitioner stated that he elected to testify at his trial because he wanted it to be on the record that he was a "mental patient." He said he understood that he would be subject to cross-examination and that trial counsel advised him that his prior convictions would be used against him. The Petitioner stated that he had twenty felony convictions at the time of his trial and that eighteen could be introduced as impeachment evidence.

The Petitioner testified that he obtained his medical records as well as letters and doctors' evaluations about his diminished capacity. He wanted his doctors to testify or give a deposition about his inability to form the requisite mental state for the crime. The Petitioner stated that trial counsel failed to obtain the VA's surveillance tape recording. He also asked trial counsel for the recordings of the grand jury proceedings and the preliminary hearings and did not receive them. The Petitioner felt that he should have been charged with unauthorized use of a motor vehicle or joyriding, but trial counsel never raised the issue.

5

On cross-examination, the Petitioner testified that the victim and his wife, along with law enforcement officers, testified at his trial. The Petitioner agreed that he had multiple prior felonies, including felony theft, and that trial counsel warned him they would be used against him if he chose to testify. He agreed that he had many convictions that were too old to be introduced at trial. The Petitioner agreed that trial counsel represented him in the appeal, but the Petitioner asserted that trial counsel raised many meritless issues in his appellate brief.

The Petitioner recalled that trial counsel challenged the State's jurisdiction because the crime occurred on federal property and that trial counsel raised the issue on appeal but failed to do any investigative work to support the argument. At trial, the trial court determined that the Petitioner's crime was a continuing offense because he drove the vehicle into Shelby County jurisdiction.

The Petitioner agreed that he was found competent in general sessions court and then his case was set for trial and trial counsel was appointed. Trial counsel had served as the Petitioner's elbow counsel prior to him being appointed but the Petitioner maintained that trial counsel never communicated with him in either role. The Petitioner agreed that he had "gone by" several different names and that the victim testified he gave an alternate name when test driving the vehicle. He agreed that he was charged with theft over $10,000 and that trial counsel convinced the jury to convict him of a lesser-included offense.

On redirect-examination, the Petitioner agreed that trial counsel elicited testimony that convinced the jury that the vehicle was worth less than $10,000. The Petitioner maintained that in the nine months that he waited for his trial, trial counsel did not contact him once. He stated that trial counsel failed to file a single motion and failed to respond to a single letter of the Petitioner's, upwards of twenty that he wrote to trial counsel.

On recross-examination, the Petitioner agreed that prior to trial counsel's representing him, another attorney had filed a motion for discovery on his behalf, along with numerous other standard motions.

Trial counsel testified that he was appointed to represent the Petitioner as elbow counsel and then became primary counsel on the day of trial. Trial counsel hired an investigator who met with the Petitioner "quite frequently," but trial counsel could not recall how many times he himself met with the Petitioner. Trial counsel testified that mental illness was discussed as a potential defense, and trial counsel's understanding was that the Petitioner wanted his mental health records introduced so a "joyriding" instruction would be given to the jury. Because the Petitioner was *pro se* leading up to trial, trial counsel could not recall whether a mental evaluation was conducted. Trial counsel "concluded" that the Petitioner was competent, based on their interactions and

6

ability to communicate with each other. The Petitioner, prior to trial counsel's representation, had filed several motions and argued them and was articulate in his understanding of the law.

Trial counsel testified that "diminished capacity" and "not guilty by reason of insanity" are two separate defenses, the first of which is a concept for the jury to analyze when determining guilt. Trial counsel conceded that had a diminished capacity defense been a good strategy he would have elected to use it but that his understanding was that the Petitioner maintained he did not commit a crime. Trial counsel stated that, based on the Petitioner's insistence that he lacked the mental capacity to steal the vehicle but did actually drive it away, they had a disagreement about trial strategy.

Trial counsel told the trial court on the first day of trial that he and the Petitioner did not "see the case the same way" but that they had agreed to proceed with trial counsel's strategy. The strategy was for the Petitioner to testify that he had every intent and purpose to return the vehicle to the victim at the VA and got scared once he learned the victim had called the police. Trial counsel intended to argue that he lacked the intent to steal and "got spooked." As to the diminished capacity defense, trial counsel obtained the Petitioner's medical records through the investigator. The medical records stated that the Petitioner had been experiencing mental health issues for years, including paranoid schizophrenia, PTSD, and bipolar disorder. An entry in the records for 2010 reported that the Petitioner was hearing voices of "good and bad angels." Trial counsel recalled that the Petitioner had been incarcerated just prior to this offense.

Trial counsel testified that he reviewed the discovery file with the Petitioner. Regarding the Petitioner's decision to testify, trial counsel went over the pros and cons with him, and the Petitioner elected to testify. The Petitioner had wanted to give his version of the events. Trial counsel recalled that the trial court reviewed the Petitioner's prior convictions that could be admitted and told the Petitioner that they could be used against him at trial if he testified.

At the conclusion of the proof, in an order, the post-conviction court made the following findings, relevant to the Petitioner's issues on appeal:

1. The State did not withhold favorable material evidence from Petitioner.

[The] Petitioner alleges that the State withheld favorable material evidence and that the State's suppression of evidence was in violation of Tenn. Const. Art. I and II, and that there was prosecutorial misconduct. These stated grounds for relief, while stated separately, amount to a claim that the State violated Petitioner's constitutional right to due process by failing to provide favorable, material evidence in its possession. To

7

establish a violation based on the withholding of favorable evidence, the [P]petitioner must demonstrate that: (1) the [P]etitioner requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014).

Here, [the] Petitioner filed motions for discovery and exculpatory evidence. Nonetheless, Petitioner has failed to show that the State suppressed evidence in its control and that the information was material. [The] Petitioner claims that the state withheld evidence because there was a discrepancy in what the victim, Justine Lane, stated in her police report from what she stated at the preliminary hearing. However, Petitioner had access to the police report and was present at the preliminary hearing and his attorney had access the preliminary hearing transcript, so the State did not suppress this evidence.

Additionally, the evidence that Petitioner claims was suppressed, was not material. [The] Petitioner asserts that there was a discrepancy regarding whether Justine Lane gave the Petitioner the keys. However, Petitioner did not state what the discrepancy was. At the Post-Conviction Hearing, [the] Petitioner stated that Justine Lane stated at the preliminary hearing that she gave [the] Petitioner the keys to test drive the car. If there was a discrepancy, it was not material because [the] Petitioner went beyond the scope of permission granted to him. Justine Lane gave the Petitioner her car keys for the purpose of test driving the car. It was understood that after test driving the car, [the] Petitioner would return it to Justine Lane. However, [the] Petitioner failed to return the car and as a result went beyond the scope of permission granted to him. Since [the] Petitioner was charged with theft of property, the issue in this case was whether the Petitioner intended to permanently deprive the victim of her property. See Tenn. Code Ann. § 39-14-103. [The] Petitioner's conviction did not depend on whether Petitioner was given the car keys or not. Further, [the] Petitioner testified at trial, the jury had Petitioner's version of events and Justine Lane's. With this information, the jury concluded Petitioner was guilty of theft. [The] Petitioner has failed to show the requisite elements necessary to establish a due process violation, as such, he is denied relief on these grounds.

3. Trial Counsel did not provide ineffective assistance of counsel.

[The] Petitioner asserts six grounds for relief on this issue. [The] Petitioner claims that Trial Counsel failed to (a) subpoena records relating

8

to petitioner's mental health; (b) obtain a transcript of the preliminary hearing; (c) seek a jury instruction on diminished capacity; (d) object to the prosecution's inappropriate instruction- on the law during voir dire; and (e) object to victim Justine Lane's narrative testimony. Additionally, [the] Petitioner asserts that Trial Counsel's questioning of [the] Petitioner during trial lead [the] Petitioner to be impeached by twenty-one prior convictions.

(a) Trial Counsel's failure to obtain [the] Petitioner 's medical records.

[The] Petitioner asserts that Trial Counsel did not obtain [the] Petitioner's medical records. However, Trial Counsel did obtain [the] Petitioner's medical records and those records were made available to Petitioner. Trial Counsel did not provide ineffective assistance of counsel, as a result, Petitioner is denied relief on this basis.

(b) Trial Counsel's failure to obtain the preliminary hearing transcript.

[The] Petitioner claims that Trial Counsel did not obtain a transcript of the Petitioner's preliminary hearing. However, Petitioner has not stated how the preliminary hearing could have been used in Petitioner's case and how Trial Counsel's failure to procure the transcript resulted in ineffective assistance of counsel. Consequently, [the] Petitioner has failed to meet his burden and is denied relief on this issue.

(c) Trial Counsel's failure to seek a diminished capacity defense.

. . . . Before Trial Counsel became [the] Petitioner's attorney, Trial Counsel was [the] Petitioner's elbow counsel and [the] Petitioner was a pro se defendant. When Trial counsel took over, Trial Counsel consulted with [the] Petitioner about the strategy for [the] Petitioner's case. According to Trial Counsel, [the] Petitioner and Trial Counsel disagreed about the trial strategy. [The] Petitioner wanted to pursue a diminished capacity defense to show that the crime was - joyriding rather than theft while Trial Counsel wanted to pursue a different defense to show the crime was joyriding. Trial Counsel wanted to show that Petitioner was not the person who made the phone call to Justine Lane claiming to be Corey Maclin and that Petitioner intended to return the car prior to being notified that the police had been called. When police were called, Petitioner got scared, so, instead of returning the car, Petitioner parked it. in front of a police officer's house. Trial Counsel stated that, although Petitioner disagreed with the strategy, Petitioner agreed to allow Trial Counsel to pursue Trial Counsel's strategy

rather than the diminished capacity strategy.

There was also a mental evaluation completed while the Petitioner's case was in General Sessions. Trial Counsel testified that he relied on the evaluation completed in General Sessions regarding the [Petitioner's] competency. He further testified that based on that mental evaluation that there was not support for an insanity defense or a defense of diminished capacity.

Trial Counsel did not provide ineffective assistance of counsel by pursuing a different strategy than what Petitioner wanted because Trial Counsel consulted Petitioner about his strategy and ultimately received Petitioner's consent to move forward. As a result, Petitioner has failed to show that Trial Counsel's conduct was unreasonable. Because Trial Counsel did not provide ineffective assistance regarding his strategy choice, Petitioner is denied relief on this basis.

The post-conviction court denied the petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because the State committed a *Brady* violation by withholding favorable evidence. He additionally contends that he received the ineffective assistance of counsel because his trial counsel: (1) failed to obtain his medical records; (2) failed to obtain a transcript from his preliminary hearing; (3) failed to seek a defense of "diminished capacity"; and (4) improperly elicited testimony from the Petitioner, which allowed his prior felony convictions to be introduced. The State responds that the Petitioner has not satisfied the requirements for proving a *Brady* violation and has failed to demonstrate that trial counsel was ineffective. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; howev-

er, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

## A. *Brady* Violation

In order to establish a *Brady* violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). A *Brady* claim in a post-conviction proceeding is "governed by the same prejudice standard as an ineffective assistance of counsel claim." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). "[A] defendant must show that there is a reasonable probability that the result of the proceedings would have been different." *Id.* at 598-99.

At the evidentiary hearing, the Petitioner testified that the victim's statement to police and her testimony at the preliminary hearing were inconsistent. The Petitioner did not provide exactly what was inconsistent, and trial counsel could not recall that an inconsistency was revealed between the two accounts of the crime. In ruling on this issue, the post-conviction court determined that the Petitioner had access to both items of evidence and had not identified what the discrepancy was between the two. The post-conviction court concluded that the Petitioner had not shown the requisite element to establish a due process violation.

The evidence does not preponderate against the findings of the post-conviction court. The Petitioner does not show that the State withheld the evidence nor does he show how the victim's statements were inconsistent or material. The Petitioner is not entitled to relief.

## B. Ineffective Assistance of Counsel

The Petitioner claims that trial counsel was ineffective for: (1) failing to obtain his medical records; (2) failing to obtain a transcript from his preliminary hearing; (3) failing to seek a defense of "diminished capacity"; and (4) improperly eliciting testimony from the Petitioner, which allowed his prior felony convictions to be introduced. The State responds that the post-conviction court properly denied relief on these claims. We agree with the State.

The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable

standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Medical Records

The Petitioner contends that trial counsel failed to obtain his medical records related to his mental illness. Relative to this claim, the post-conviction court accredited trial counsel's testimony that he had obtained the records and hired an investigator to review them.

The evidence does not preponderate against the trial court's findings. Trial counsel testified that he had obtained the voluminous records with the help of his investigator and that those records were made available to the Petitioner. The Petitioner has not shown by clear and convincing evidence that trial counsel failed to obtain his medical records; therefore, we conclude that trial counsel was not ineffective in this regard. Accordingly, the Petitioner is not entitled to relief as to this claim.

### 2. Preliminary Hearing Transcript

The Petitioner claims that trial counsel was ineffective for failing to obtain his preliminary hearing transcript. The post-conviction court denied relief because the Petitioner did not testify about how the transcript would have been used in his defense or present any testimony about how the absence of the preliminary hearing transcript impacted his case. The evidence does not preponderate against this finding. The Petitioner failed to present evidence or testify at the post-conviction hearing, and fails to state on appeal, the purpose for which he would have used the preliminary hearing transcript. As stated above, he claims there are inconsistencies between the testimony at the hearing and at trial, but fails to identify the alleged inconsistencies or offer any evidence in support of his allegation that the absence of the transcript prejudiced him. The Petitioner is not entitled to relief on this issue.

### 3. Diminished Capacity Defense

The Petitioner claims that trial counsel was ineffective for failing to present a defense of diminished capacity. The post-conviction court found that trial counsel determined that there were no grounds for this defense and discussed a different trial strategy with the Petitioner which was that he was merely taking the vehicle for a "joyride." Ultimately, the Petitioner assented to trial counsel's strategy. We will not second-guess the decision by trial counsel not to pursue a certain defense, as his was an

13

informed decision based upon adequate preparation. *See House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief.

## 4. Direct-Examination of the Petitioner

The Petitioner contends that trial counsel failed to properly question him on direct examination which resulted in his multiple prior felony convictions being introduced as impeachment evidence. The post-conviction court concluded this issue had already been addressed by this court and thus was not subject to further consideration. *See* T.C.A. § 40-30-106(f); *State v. Walter Shegog*, No. W2014-02440-CCA-R3-CD, 2015 WL 12978195, at \*5 (Tenn. Crim. App. Oct. 13, 2015), *perm. app. denied* (Tenn. Feb. 19, 2016). We agree and as a result, the Petitioner is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE